**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 98 C 6389 |
| | ) |
| USX CORP., et al., | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

In 1999, the Waukegan Community Unit School District 60 and six other parties entered into a consent decree with the United States to resolve their potential liability under the Comprehensive Environmental Response Compensation and Liability Act (CERCLA), 42 U.S.C. § 9607. The School District now asks the Court to provide relief from the consent decree under Federal Rule of Civil Procedure Rule 60(b)(5) or 60(b)(6). The District contends that it is entitled to relief because the decree has become an increasing financial burden and because the District recently discovered facts that allegedly show it is not liable under CERCLA. For the following reasons, the Court denies the District's motion.

### Facts

In 1964, the District contemplated building a high school on a lar,ge tract of land located in Waukegan, Illinois. Because the land was low, marshy, and subject to periodic flooding, the District signed a document authorizing the City of Waukegan and National Disposal Service of Illinois, Inc. (NDS) to fill the land with waste. Unfortunately, proper precautionary measures were not taken to prevent hazardous materials from seeping into the ground, and in the 1980s the

EPA discovered that chemicals were contaminating nearby Yeoman Creek.

In 1999, the United States, the District, and more than a dozen other parties potentially responsible for the contamination of the site (now known as the Yeoman Creek Landfill) settled their claims against each other. The resulting consent decree established how the parties would carry out and fund the site's clean-up. The agreement provided that the parties would bear joint and several liability for the clean-up costs, meaning that if one party defaulted on its responsibilities, the other parties would assume the defaulting party's liability in proportionate fashion.

To date, the District has paid over $1,700,000 in satisfaction of its obligations under the decree, but clean-up costs continue to accrue. The District estimates that it may be responsible for paying an additional several hundred thousand dollars before all is said and done. It concedes, however, that the total cost for the clean-up project has not exceeded the EPA's or the settling parties' 1999 estimates. *See* Reply at 5 n.5.

The District maintains that it is entitled to relief from its obligations under the decree for two different reasons: it can no longer afford to pay its share of the clean-up costs, and it recently discovered that it never owned Yeoman Creek Landfill and could not have legally authorized the land's use as a landfill. With regard to the first reason, the District points out that it lost money between 1997 - 2002 and in 2004 and that it has been in debt since 2001. It has submitted a balance sheet that show it currently owes around $9,000,000. *See* Ex. A. It is not clear to whom the money is owed. The District also contends that its expenditures related to bilingual education requirements have nearly doubled since 1999, increasing by a total of more than $4,000,000, and that the federal No Child Left Behind Act has imposed additional financial

burdens that were unanticipated when it entered the settlement agreement. Finally, the District says that its share of liability increased after another settling defendant, Outboard Marine Corporation, filed for bankruptcy.

With regard to the second reason, the District contends that it recently became aware that it never owned the Yeoman Creek Landfill, meaning it was not actually liable for any of the environmental problems. According to the District, its attorneys recently discovered that the land is owned by the Lake County School Trustees, who hold title to the land in trust for the benefit of the School District.

## Discussion

Rule 60(b) of the Federal Rules of Civil Procedure allows a district court to relieve a party from a judgment for a number of different reasons: "(1) mistake, inadvertence, surprise, or excusable neglect; . . . (5) . . . it is no longer equitable that the judgment should have prospective application . . . or (6) any other reason justifying relief from the operation of the judgment."

**1. Rule 60(b)(5)**

Under Rule 60(b)(5), a district court may modify a consent decree if it has become unjust, illegal, or unenforceable due to changed factual or legal circumstances. *See Shakman v. City of Chicago*, 426 F.3d 925, 931 (7th Cir. 2005). The party seeking modification of the decree bears the initial burden of showing "a significant change either in factual conditions or in law." *O'Sullivan v. City of Chicago*, 396 F.3d 843, 862 (7th Cir. 2005). If the moving party meets this burden, "a district court should consider whether the proposed modification is 'suitably tailored to the changed circumstances.'" *Id.* (quoting *Rufo v. Inmates of Suffolk County*, 502 U.S. 367, 383 (1992)). In cases involving local government decision-makers,

3

principles of federalism demand that a district court exercise flexibility in considering a request for modification of a consent decree. *See Rufo*, 502 U.S. at 383. A consent decree will not be modified, however, simply because "it is no longer convenient to live with [its] terms." *Id.*

In *Rufo*, a county sheriff filed a motion to modify a consent decree that required him to build a larger jail that allowed for single-cell occupancy. *Id.* at 376. The sheriff contended that the inmate population had increased beyond initial projections, and intervening legal decisions established that double-celling was not in all cases unconstitutional. *Id.* at 376. The district court refused to grant the requested modification, but the Supreme Court reversed and remanded. *Id.* at 372. The Court held that the district court should have determined whether the upsurge in inmate population was anticipated by the sheriff when he entered into the consent decree. *Id.* at 385. If it was, the Court said, the increased population would not constitute a change in factual circumstances warranting relief under Rule 60(b)(5). *Id.*

The Supreme Court applied the *Rufo* legal standard again in *Agostini v. Felton*, 521 U.S. 203 (1997). In *Agostini*, the petitioner, the Chancellor of the Board of Education of New York City, moved to modify a consent decree involving the use of Title I funding in parochial schools, claiming that the cost of complying with the decree was exorbitant. *Id.* at 215-16. The Court held that it was improper to modify the decree on these grounds, because the petitioner did not establish that the decree's costs were unanticipated. *Id.* at 216. Rather, the Court said, petitioners were "aware that additional costs would be incurred if Title I services could not be provided in parochial school classrooms." *Id.* Circuit courts have also repeatedly cited *Rufo* to deny relief under Rule 60(b)(5) when the moving party anticipated the changes claimed to support modification of a consent decree. *See, e.g., United States v. Asarco Inc.*, 430 F.3d 972,

4

982 (9th Cir. 2005); *Thompson v. HUD*, 220 F.3d 241, 248 (4th Cir. 2000).

The District asks the Court to modify the 1999 decree, in short, because its financial circumstances have taken a turn for the worse. The District has not shown, however, that these circumstances have changed – if they have changed at all – in an unanticipated manner. In 1994, during settlement negotiations, the District argued that "it is impossible for the District to take money from the existing budget to pay an allocation[,] as such a diversion of money would almost certainly result in the collapse of the District." Def. Browning-Ferris Ex. 10 at 8. During the same negotiations, the District also noted that it had operated a budget deficit during nine of the past ten years. *Id.* In 1997, the District told Judge Leinenweber that it "accepted its allocation without any present ability to pay its full allocated share of cleanup costs." Waukegan Community Unit School District No. 60's Supplemental Objection at 1, *Waukegan Cmty. Unit Sch. Dist. No. 60 v. Abbott Labs.*, No. 92 C 7592 (N.D. Ill. Mar. 24, 1997) (docket no. 288). Indeed, the consent decree itself suggests the parties anticipated future financial difficulties. *See* Consent Decree ¶46 ("[The] inability to demonstrate financial ability to complete the Work shall not excuse performance of any activities required under this Consent Decree."). Given the consent decree's plain language, together with the District's repeated insistence during settlement negotiations that its financial circumstances were dire, it is difficult to see how the District's current financial situation could be considered unanticipated.[1]

The District next argues that factual circumstances have changed because school

---

[1] The District also contends that factual circumstances have changed because its share of liability increased after one of the settling defendants went bankrupt. However, this circumstance was likewise anticipated. The District specifically agreed to bear this risk by consenting to joint and several liability. *See* Consent Decree ¶6(c).

5

officials recently determined that it never owned the Yeoman Creek Landfill and could not have been held liable under CERCLA. In other words, according to the District, its attorneys and other agents who participated in the consent decree negotiations during the 1990s never learned the District's actual status and, as a result, the District consented to pay for clean-up costs it was not legally obligated to bear.

Without addressing whether the District is correct in arguing that it bore no responsibility for its acts under CERCLA, the Court concludes that this purported change in circumstances is insufficient to support relief under Rule 60(b)(5). *See Thompson*, 220 F.3d at 247. In *Thompson*, the plaintiffs were a group of African-American public housing residents who claimed that the Baltimore public housing system was segregated. *Id.* at 243. The parties entered a consent decree in which the defendants agreed not to construct new public housing facilities in areas containing high concentrations of minorities or public housing. *Id.* at 244. To satisfy the consent decree, defendants initially planned to rehabilitate a 1,000 unit public housing facility called Hollander Ridge by reducing the population density and upgrading the housing units and amenities. *Id.* at 245. After a HUD study concluded that the poor physical condition of Hollander Ridge made the plan prohibitively expensive, the defendants developed a new plan, in which the city would demolish Hollander Ridge and build new public housing for senior citizens in its place. *Id.*

Because the new plan clearly violated the provision of the consent decree prohibiting construction of new public housing facilities in areas with high minority concentrations, the defendants sought leave to modify the consent decree under Rule 60(b)(5). *Id.* The district court granted the defendants' motion, *id.* at 246, but the Fourth Circuit reversed. *Id.* at 248. It held

6

that the defendants' post-decree discovery that Hollander Ridge could not be rehabilitated was not a change of circumstances. *Id.* at 247. The court said:

> The reasons that Hollander Ridge could not be rehabilitated, including the need for extensive repairs, the cost of those repairs, and the undesirability of Hollander Ridge because of its isolation, all existed before the entry of the Consent Decree. The only relevant post-Decree event was the issuance of the [HUD] report, which did not itself render Hollander Ridge unusable as a site for family public housing. Instead, the [HUD] report merely expressed an opinion that the conditions at Hollander Ridge made it unlikely that the Local Defendants' original modernization plan would be economically viable. . . . A modification of a consent decree must be based on a change of facts, *not a change in opinion about the effect of unchanged facts*.

*Id.* (emphasis added).

Here, as in *Thompson*, the District has not demonstrated that any facts have changed since entry of the Consent Decree. Indeed, its ownership status was the same in 1999 as it is now. At most, it has demonstrated a that there has been a change in its perception or knowledge of certain unchanged facts – facts that the District ought to have investigated before it entered into the consent decree. As *Thompson* discusses, this type of change is insufficient to merit relief under Rule 60(b)(5). Because the District has not made the required threshold showing that there has been an unanticipated change in fact or law, the Court denies its motion under Rule 60(b)(5).[2]

### 2. Rule 60(b)(6)

The District also argues that it is entitled to relief from the Consent Decree under Rule 60(b)(6) A district court may utilize this "catch-all" provision only in "exceptional

---

[2] The District also contends that it recently discovered it is not a "person" under CERCLA and therefore could not have been held liable for the contamination at the Yeoman Creek Landfill. Like the District's realization that it did not own the landfill, the District's new understanding of its legal status under CERCLA is not a change in factual circumstances that supports Rule 60(b)(5) relief. *See Thompson*, 220 F.3d at 247.

circumstances." *Helm v. Resolution Trust Corp.*, 84 F.3d 874, 879 (7th Cir. 1996); *see also* 11 Charles A. Wright, et al., Federal Practice & Procedure § 2864 (2d ed. 1995). Relief is unavailable under this section where such relief is properly sought under one of the other Rule 60(b) provisions. *See Liljeberg v. Health Serv. Acquisition Corp.*, 486 U.S. 847, 863 n. 11 (1988). The District argues that relief is proper under Rule 60(b)(6), again, because it recently discovered that it never owned the Yeoman Creek Landfill and could not have been liable under CERCLA. At bottom, however, this reason amounts to little more than a claim of attorney neglect or oversight, which does not justify reopening a seven year-old judgment. *See Helm*, 84 F.3d at 879 (denying 60(b)(6) relief where plaintiff's attorney unsuccessfully brought suit under one statute and later realized that bringing suit under another statute would have been more effective; stating that "inexcusable attorney negligence is not an exceptional circumstance justifying relief under Rule 60(b)(6)); *Provident Savings Bank v. Popovich*, 71 F.3d 696, 700 (7th Cir. 1995) (denying 60(b)(6) relief where defendant attempted to raise theories available but not raised previously); *Moolenaar v. Govt. of the Virgin Islands*, 822 F.2d 1342, 1347 (3d Cir. 1987) (denying 60(b)(6) relief where plaintiffs "simply failed to present evidence which was available to them from the outset.").

The cases cited by the District do not call for a different result. *Good Luck Nursing Home, Inc. v. Harris*, 636 F.2d 572, 577 (D.C. Cir. 1980), and *Gray v. Estelle*, 574 F.2d 209, 215 (5th Cir. 1978), do appear to hold that Rule 60(b)(6) relief is available when a party presents previously undisclosed evidence that shows the initial judgment was unjust, even though the non-disclosure was the result of the party or party's attorney's own inexcusable neglect. Other circuits, however, have questioned *Good Luck Nursing Home*'s reading of Rule 60(b)(6) as

8

overly broad. *See Lavespere v. Niagra Mach. & Tool Works, Inc.*, 910 F.2d 167, 173 (5th Cir. 1990), *abrogated on other grounds by Little v. Liquid Air Corp.*, 37 F.3d 1069, 1076 n. 14 (5th Cir. 1994); *Moolenaar*, 822 F.2d at 1347-48. In addition, the Seventh Circuit appears to interpret 60(b)(6) more restrictively. *See Helm*, 84 F.3d at 879; *Provident Savings*, 71 F.3d at 700.

Finally, even if the Seventh Circuit were to decide to follow the *Good Luck Nursing Home* approach, which seems unlikely given its holdings in *Helm* and *Provident Savings*, *Good Luck Nursing Home* and *Gray* are distinguishable on their facts. In those cases, the party seeking Rule 60(b)(6) relief presented new evidence two months and three months, respectively, after the initial judgment was entered, so that the non-moving party was not unduly prejudiced by vacating the judgment. Indeed, the court in *Good Luck Nursing Home* stressed that a previously undisclosed fact must be *timely* presented if it is to justify Rule 60(b)(6) relief. In this case, the District seeks relief from a consent decree entered seven years ago. "The temporal proximity between the judgment and Rule 60(b)(6) motion in *Good Luck Nursing Home* distinguishes that case from the present one." *Moolenaar*, 822 F.2d at 1348.

**Conclusion**

For the reasons stated above, the Court denies the District's motion for equitable prospective relief of judgment [docket no. 64].

                                                                                                      _____
                                                                                              MATTHEW F. KENNELLY
                                                                                              United States District Judge

Date: June 27, 2006